## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MARK O'CONNELL,

   Plaintiff,

vs.            CIV. No.  03-979 BB/DJS

CITY OF SANTA FE, BILL BRYANT
KYLE ZUMENTS, ST. VINCENT HOSPITAL,
LISA MCLAUGHLIN, and KELLIE MONAHAN,

   Defendants.

### MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court for consideration of a motion for summary

judgment filed by Defendants City of Santa Fe ("City"), Bill Bryant ("Bryant"), and Kyle Zuments

("Zuments") (Doc. 15), as well as a motion to supplement the record (Doc. 27) filed by Plaintiff.

**Facts**

The following facts are stated in the light most favorable to Plaintiff.  Plaintiff was accused

of digitally penetrating the anus of a two-and-a-half-year-old boy ("Boy").  Plaintiff was

subsequently acquitted of this charge by a jury. The events precipitating this charge began on May

28, 2000, when Boy's mother ("Mother") brought him with her to a recording studio where

Plaintiff was employed as a sound engineer.  While Mother was recording, Plaintiff spent some

time with Boy.  Mother subsequently thought Boy was acting strangely, suspected something

unusual had occurred, and decided to take Boy to the hospital.  At the hospital Boy was examined

first by Dr. Lieberman, an emergency room physician.  According to Dr. Lieberman's written

report, he found only a "slight reddening and slight erythema of the rectal mucosa."  [Exh. A,

Mot. to Supplement]  In order to examine Boy, Dr. Lieberman used a "small amount of

lubrication" [*Id.*] and allegedly performed a digital rectal exam.  [Exh. 3, MSJ, p. 28] Dr.

Lieberman then referred Boy and Mother to Defendant McLaughlin (the Court will refer to this

Defendant as "Leiding" because that was her surname at the time).  Leiding was a nurse trained in

conducting examinations in cases involving allegations of sexual abuse.  Leiding interviewed both

Mother and Boy separately, and examined Boy's anal area.  At the time she performed the

examination, Leiding was unaware that Dr. Lieberman had digitally examined Boy, because

Mother did not inform Leiding of this fact until a follow-up examination that occurred over a

week later.  [*Id.*]  Contrary to Dr. Lieberman's failure to find anything in the anal area other than

the slight reddening and erythema (rash, or redness of the skin) noted above, Leiding found three

small abrasions which were "non-specific indications for digital penetration."  [Exh. 1, MSJ]

According to Leiding, this language means the abrasions could have been caused by digital

penetration, but could also have been caused by constipation or by rubbing the area with rough

toilet paper.  [Exh. 3, MSJ, pp. 67-68]  During Leiding's interview of Boy, he never identified the

person who had poked him in the butt; he just said "He" had done it.  Mother, however, told

Leiding that Plaintiff was the person who did it.  [*Id.*, pp. 43, 60]

       While Leiding was interviewing Mother and Boy, Officer Zuments was present at

Leiding's request.  Leiding later testified she would not have told Officer Zuments that Boy's

injuries were "consistent with" digital penetration, but would have used the "non-specific

indications" language.  [*Id.*, pp. 58, 68-69]  In addition, Leiding testified at trial that she would

not have told Zuments the three small abrasions in the anus were a "large tear" consistent with

anal penetration.  [Exh. 2A, MSJ, p. 121]  Despite this, Zuments wrote a report stating that

Leiding had told Zuments she had found a "large rectal tear on Boy's rectum that was consistent

with anal penetration." [Exh. 4, MSJ]  The report also recited Mother's statements to Zuments

and Leiding, including allegations that Boy told Mother that Plaintiff poked his butt, that Mother

looked at Boy's rectum and saw a tear, and that Plaintiff became defensive when asked if he had

taken Boy to the bathroom.  [*Id.*]  On June 9, 2000, after Mother brought Boy back to Leiding

for a follow-up examination, Leiding wrote a report memorializing what she had found during the

first examination, what she had been told during her interviews of Mother and Boy, and what she

found during the follow-up examination--the three abrasions had healed, but there was a new one

in a different location.  [Exh. 1, MSJ]

   After Zuments wrote his report, the matter was turned over to Defendant Bryant for

investigation.  On May 30, 2000, the day after Leiding first examined Boy, Bryant scheduled and

was present for a Safe House interview of Boy, by interviewers trained in techniques for

conducting interviews of alleged child sex abuse victims.  [Exh. 6, MSJ, pp. 15-16]  Boy said

nothing about the alleged incident, despite being interviewed by two different people.  [Exh. 4,

MSJ, p. 4 of report]  After this interview, it can be fairly inferred, viewing the facts in the light

most favorable to Plaintiff, that Bryant did little or no further investigation into the case.  Bryant's

report of his investigation does not reveal any independent interview of either Leiding or Mother;

instead, the report simply repeats the contents of Zuments' original report and what Zuments

allegedly learned from Leiding and Mother.  [Exh. 4, MSJ, Supp. 01 to Offense Report]  Bryant

did not obtain a copy of Leiding's written report.  He did not find out that according to Mother,

Dr. Lieberman had digitally examined Boy's rectum before Leiding performed her examination.

Although Bryant claims he attempted to interview Tim Stroh and Jim Wilson, two potential

witnesses who were at the studio on the night of the incident, both Stroh and Wilson flatly denied ever being contacted by Bryant.  [Exh. 2B, MSJ, pp. 76, 98]  Bryant never contacted Plaintiff, although Plaintiff continued to work at the studio.  [*Id.*, pp. 120, 171; Exh. B, Resp.]  Bryant did not contact anyone else who was at the studio on the night of the incident, including at least two witness who testified at trial that Boy never seemed traumatized the night of the incident, and that Mother returned to the studio the next day and had Boy with her, even though Plaintiff was working at the studio again the next day.  [Exh. 2B, MSJ, pp. 27-28, 45-46, 118]

Almost nine months elapsed between the time Bryant was assigned to the case, May 30 of 2000,  and the time he apparently finalized his supplemental report and submitted the investigative file to the district attorney's office, February 21 of 2001.  [Exh. 4, MSJ, report and transmittal letter][1]  Despite this lengthy opportunity for investigation, the only information Bryant added in his supplement to Zuments' original report was Plaintiff's last name, the summary of the unproductive Safe House interview, and the fact that Plaintiff had been reported missing by his girlfriend in late July 2000.  [Exh. 4, MSJ, Bryant supp.]  Plaintiff's girlfriend also apparently reported that Plaintiff had stolen her vehicle, a fact also included in Bryant's report.  [*Id.,* Bryant supp. and Lisa Ernst report]  Bryant failed to include in his report the fact that Plaintiff was apparently located in Albuquerque a few days after he was reported missing, and was removed from the NCIC database.  [*Id.*, Holliday supp. to Ernst report]

---

[1]Defendants state that Bryant submitted his report to the district attorney's office on July 27, 2000; however, the transmittal letter is dated February 21, 2001.  For purposes of this opinion, therefore, viewing the facts in the light most favorable to Plaintiff, the Court assumes the report was not completed and sent to the district attorney's office until the latter date.

Almost a year after the investigative report was submitted to the district attorney's office, a grand jury proceeding was held in the case, on January 17, 2002.  [Exh. 6, MSJ]  The only witnesses for the State were Mother, Zuments, and Bryant.  Mother's testimony, reduced to its essentials, was as follows:  (1) at the recording studio Boy told her that his butt hurt, which surprised Mother because Boy had never used the word "butt"; (2) Mother examined Boy's anus and saw that it was very red; (3) when she came out of the bathroom with Boy Plaintiff was standing nearby acting fidgety, with a bead of sweat on his forehead; (4) Mother took Boy outside and asked him, without identifying Plaintiff by name, whether "he" had touched Boy, and whether "he" had told Boy not to tell Mother; (5) when asked to tell where he had been touched, Boy pointed to his behind; (6) Boy told the police officers at the hospital that the "guy" had stuck his finger up his butt; and (7) the nurse at the hospital (Leiding) said that the anus "definitely revealed tears from a digit going inward."  [Exh. 6, MSJ, pp. 2-10]

Zuments testified next, and essentially recited the contents of his report.  He testified that according to Mother, Boy had advised her that "Mark" poked his finger in his butt; that Boy kept repeating this during the interview at the hospital; and that according to Leiding, she had found a large rectal tear on Boy's rectum.  [*Id.*, pp. 11-14]  Bryant then testified about the unhelpful Safe House interview;  that Boy had allegedly disclosed to Zuments and Leiding that Plaintiff had stuck his finger in Boy's butt; that there was medical evidence showing rectal tearing, which was consistent with penetration; and that Jim Wilson was reluctant to get involved and wouldn't talk to Bryant.  Bryant then elaborated on his report by claiming that Plaintiff had left the state; that his girlfriend had reported him missing; that Plaintiff stole her vehicle; that "we" had information that Plaintiff had moved back to Florida; and that he had been unable to locate Plaintiff "to this

day." Finally, Bryant claimed he had interviewed five other people concerning the allegations, all of whom were very uncooperative. [*Id.,* pp. 14-17]

As a result of the grand jury testimony of Mother, Zuments, and Bryant, Plaintiff was indicted and arrested. He was unable to pay his bond, and remained incarcerated until he was tried and acquitted in September 2002. Plaintiff then brought this lawsuit, raising the following claims against Zuments, Bryant, and the City: (1) violation of Plaintiff's Fourth Amendment rights, since he was arrested as a result of these Defendants' inadequate investigation of the alleged offense as well as the false testimony given by Zuments and Bryant at the grand jury proceeding; (2) violation of Plaintiff's Fourteenth Amendment rights due to the same false testimony; and (3) state-law claims under the New Mexico Tort Claims Act ("TCA"). These Defendants have moved for summary judgment on all claims, and Plaintiff has moved to supplement the summary-judgment record with a copy of a report prepared by Dr. Lieberman.

**Motion to Supplement**

Plaintiff has obtained a copy of a report prepared by Dr. Lieberman, the emergency room doctor who examined Boy before Leiding did. [Exh. A, Mot. to Suppl.] This report reveals that Dr. Lieberman noticed only a redness in Boy's anus, and did not see the three abrasions found by Leiding in her examination. The report also corroborates Leiding's statement that according to Mother, Dr. Lieberman digitally examined Boy's rectum, as the report states Dr. Lieberman examined the rectum "with a small amount of lubrication" and distinguishes between the external exam and the anal surface. The fact that Dr. Lieberman digitally examined Boy shortly before Boy was interviewed by Leiding could account for Boy's exclamation that "He" poked Boy in the butt. Finally, the report indicates Boy was not uncomfortable during the exam, and did not talk

about any sexual contact.  Obviously, this report is significant with respect to the question of Plaintiff's innocence or guilt, as it provides an alternate explanation for the three abrasions found by Leiding during her exam and for Boy's exclamations, indicates the abrasions were not present prior to Dr. Lieberman's digital examination of Boy's rectum, and contradicts the idea fostered by Mother's testimony that Boy was traumatized by something that happened at the studio.

Defendants contend the motion to supplement should be denied and the report should not be considered by the Court in deciding the summary judgment motion.  Defendants acknowledge this Court has discretion to allow supplementation of the record or to deny such a request. Nevertheless, Defendants argue the motion should be denied for two reasons:  first, Leiding acknowledged she did not tell either Zuments or Bryant about Dr. Lieberman's examination of Boy; and second, Plaintiff should have known about the report prior to the deadline for responding to the motion for summary judgment, and should have been able to obtain a copy and submit the same during the briefing process.  The Court will grant the motion to supplement.  The fact that the Defendant officers did not know about the examination by Dr. Lieberman, or his report, is relevant to the issue of the adequacy of the investigation performed in this case.  If Bryant had interviewed Leiding during his investigation, there is at least some likelihood she would have told him about Dr. Lieberman's examination, which should have caused him to investigate Dr. Lieberman's involvement in the case.  The report is evidence of what Bryant could have discovered as a result.  As to the untimeliness, Defendants have not alleged they suffered any prejudice as a result of Plaintiff's failure to discover this document in a more timely manner.  The Court will not exclude this relevant document simply because it might have been discovered earlier.

**Motion for Summary Judgment**

In addressing the motion for summary judgment, the Court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Serv.*, 165 F.3d 1321, 1326 (10th Cir. 1999). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must also keep in mind that no discovery has apparently been performed in this case,[2] because Zuments and Bryant have claimed qualified immunity and requested a stay of discovery. Defendants have raised a number of arguments in support of their motion. The Court will first address the arguments that are easily decided, and then move on to the more difficult issues.

**Statutory Immunity Under NMSA § 32A-4-5:** Zuments and Bryant maintain they are entitled to absolute immunity from both the federal constitutional claims and the state-law claims, under a New Mexico statute granting such immunity. The statute in question, NMSA §§ 32A-4-1 *et seq.*, states in relevant part that a law enforcement officer who has a reasonable suspicion that

---

[2]The status of discovery is not entirely clear at this point. Although these Defendants did request a stay, the Court can find no indication in the case file that the request for stay was ever granted. However, the parties have acted as if such a stay is in effect. Furthermore, although Plaintiff's counsel filed a Rule 56(f) affidavit requesting discovery into certain matters, counsel also indicated to the Court at a recent hearing that no such discovery is necessary before the Court rules on the motion for summary judgment. In fact, at that hearing the Court specifically granted the parties 24 hours to indicate whether the limited discovery granted by the Court at that hearing, with respect to other Defendants in the case, should extend to these City Defendants. The Court has received no response to that invitation. [Doc. 36, clerk's minutes of hearing held Feb. 1, 2005]

a child is "an abused or neglected child" must report the matter immediately.  § 32A-4-3(A).  Any person reporting such an instance of alleged child neglect or abuse "is presumed to be acting in good faith and shall be immune from liability, civil or criminal, that might otherwise be incurred...unless the person acted in bad faith or with malicious purpose."  § 32A-4-5(B).

Zuments and Bryant argue they were required by this statute to report the alleged sexual abuse of Boy, and are therefore immune from all liability that might otherwise arise out of their actions.  The Court disagrees.  The statute defines an "abused child" narrowly rather than broadly; in the context of sexual abuse, an abused child is one who has suffered sexual abuse or sexual exploitation "inflicted by the child's parent, guardian, or custodian."  § 32A-4-2(B)(3).  Boy, who was allegedly sexually abused by an acquaintance rather than a parent, guardian, or custodian, does not qualify as an abused child under the statute.  *See People v. Beardsley*, 688 N.W.2d 304, 307-08 (Mich. App. 2004) (construing Michigan statute containing similar language).  Since a law enforcement officer's duty under the statute is only to report a reasonable suspicion that a child is "an abused or a neglected child" as defined by the statute, the actions of Zuments and Bryant fall outside the parameters of the law, including the immunity it grants to those reporting an instance of alleged child neglect or abuse.[3]

**Due Process Claim:**  The City Defendants argue Plaintiff's Fourteenth Amendment claim must be dismissed, as there is no evidence that either Zuments or Bryant did anything that would

---

[3]Due to this holding, the Court need not address the difficult issue of whether this state statute could immunize the officers against federal constitutional claims.  The Court does note that the case cited by Defendants in support of that proposition, *Thomas v. Chadwick*, 224 Cal.App.3d 813 (1990), involved a case of suspected abuse by the victim's parents.  *Thomas* therefore, unlike this case, fell squarely within the coverage of California's version of the law requiring certain persons to report suspected instances of child neglect or abuse.

shock the conscience of the Court.  Therefore, argue Defendants, no viable claim of substantive

due process has been established.  In response, although Plaintiff briefly mentions the Fourteenth

Amendment, Plaintiff appears to agree that the Fourth Amendment is the appropriate

constitutional vehicle for his federal claims.  This point is well conceded;  the Tenth Circuit has

held that the Fourth Amendment governs pretrial deprivations of liberty, and since Plaintiff was

not convicted he suffered no post-trial deprivation of liberty.  *See Taylor v. Meacham*, 82 F.3d

1556, 1560 (10th Cir. 1996).  Therefore, the motion for summary judgment will be granted as to

the Fourteenth Amendment claim alleged in the complaint.

**Statute of Limitations Defense to State-Law Claims:**  Defendants argue that Plaintiff

did not give notice of his claims under the New Mexico Tort Claims Act ("TCA") within the time

required by that statute, and also did not file his lawsuit within the limitations period established

by the TCA.  NMSA § § 41-4-15, 41-4-16.  Defendants' contention is based on the proposition

that the notice period and limitations period both began to run at the time Zuments and Bryant

investigated the charge made by Mother against Plaintiff.  In other words, Defendants contend

these statutory deadlines began to run at the time of the act giving rise to Plaintiff's claim.  This is

not the law in New Mexico, although the Court recognizes there is some confusion as a result of a

fairly recent New Mexico Court of Appeals opinion.

The New Mexico Supreme Court has held that the language of the TCA is plain:  the

limitations period begins to run when an "occurrence resulting in loss" takes place, and therefore

cannot start to run until a loss occurs.  *Aragon & McCoy v. Albuquerque Nat'l Bank*, 659 P.2d

306, 310 (N.M. 1983).  The New Mexico Court of Appeals has consistently followed this rule

since *Aragon* was decided, and has held that the same rule applied to the limitations provision of

10

the TCA should be applied to the notice provision of that statute as well.  *See, e.g., Bolden v. Village of Corrales*, 809 P.2d 635, 635-36 (N.M. App. 1990); *Long v. Weaver*, 730 P.2d 491, 493-94 (N.M. App. 1986); *Emery v. Univ. of New Mexico Med. Center*, 628 P.2d 1140, 1144-45 (N.M. App. 1981) (given similarities between § 41-4-15 and 41-4-16, time when statutory periods begin to run should be construed in similar manner).  In a recent case, however, the Court of Appeals decided the TCA limitations period should begin to run on the date of the action giving rise to the claim, rather than on the date that action causes loss or the date the cause of the loss is discovered.  *Maestas v. Zager*, 105 P.3d 317 (N.M. App. 2004), *cert. granted*, ___ P.3d ___. The *Maestas* court rejected the "discovery" rule, under which a limitations period does not begin to run until the victim knows or should know both of the injury he has suffered and of the cause of that injury.  *Maestas* also, however, rejected the rule stated in *Aragon*, *Bolden, Long,* and *Emery* -- that the limitations period begins to run when a loss occurs, and is manifest and ascertainable.

If *Maestas* is binding on this Court, Defendants' argument, that the limitations and notice periods began to run when Zuments and Bryant conducted their investigations and filed their reports, would prevail.  In interpreting state law, however, this Court is bound by the most recent pronouncement of that law by the highest court of the state, in this case the New Mexico Supreme Court.  *Cooper v. Cent. Southwest Servs.*, 271 F.3d 1247, 1251 (10th Cir. 2001). Opinions, such as *Maestas*, by an intermediate court of appeals are not binding but may be considered by the Court in construing state law.  As pointed out above, the most recent authority from the New Mexico Supreme Court is to the effect that the limitations period of the TCA begins to run not when the action causing the loss takes place, but when the loss itself occurs.

11

*Aragon*.  In this case, Plaintiff did not suffer a loss merely by being investigated; the earliest date

he actually felt an impact from Defendants' actions was when he was indicted and arrested.[4]  The

Court will therefore reject Defendants' argument concerning the statute of limitations and notice

provisions of the TCA.

      **Absolute Immunity for Grand Jury Testimony:**  Plaintiff's claims are based in part on

the allegedly false testimony given by Zuments and Bryant at the grand jury proceeding resulting

in Plaintiff's indictment.  Zuments and Bryant maintain they are entitled to absolute immunity for

such testimony.  Witnesses at a grand jury proceeding are normally entitled to absolute immunity

for their testimony.  *Anthony v. Baker*, 955 F.2d 1395, 1399-1400 (10th Cir. 1992).  There is an

exception to this rule, however, if the witness is considered a "complaining witness."  *Id.*  A

complaining witness is a person who "actively instigated or encouraged the prosecution of the

plaintiff."  *Id.*, p. 1399, n.2.

      The question of whether either Zuments or Bryant, or both, could be considered a

complaining witness is not easily answered at this stage of the case.  A police officer investigating

a case can become a complaining witness by applying for an arrest warrant, or filing a criminal

complaint.  *See, e.g., Malley v. Briggs*, 475 U.S. 335, 340-41 (1986); *Gauger v. Hendle*, 349

F.3d 354, 358 (7th Cir. 2003).  Merely providing false testimony to a grand jury, however, is not

enough to make an officer a complaining witness.  *Cervantes v. Jones*, 188 F.3d 805, 810 (7th

Cir. 1999), *rev'd on other grounds*, *Newsome v. McCabe*, 256 F.3d 747, 751 (7th Cir. 2001).  In

---

     [4]The Court need not decide at this point exactly when the limitations and notice periods
began to run in this case; for purposes of this motion it is enough to decide that the only argument
made by Defendants, that the periods started to run at some point during the investigation, is not
correct.

between these two extremes are cases like this one, in which the Defendant officers provided reports to the district attorney prior to the decision to pursue an indictment.  In such situations, the question of whether the officers should be considered complaining witnesses depends on a number of factors.  For example, if the district attorney's office performs its own investigation and independently decides to pursue an indictment, without encouragement from the officers, the officers will not be considered complaining witnesses.  *See* W. Page Keeton *et al.*, *Prosser and Keeton on the Law of Torts* § 119, p. 872 (5th ed. 1984); *cf. White v. Frank*, 855 F.2d 956, 962 (2d Cir. 1988) (exercise of independent judgment by prosecutor in deciding to initiate criminal case may decrease likelihood that an officer will be considered to have "caused" the prosecution, if the officer has merely stated to the prosecutor what he believes).  On the other hand, if the officers actively encourage or advocate prosecution of the plaintiff, or the district attorney's office relies heavily on false information provided by the officers in deciding to prosecute, the officers could be treated as complaining witnesses.  *See, e.g., Harris v. Roderick*, 126 F.3d 1189, 1198-99 (9th Cir. 1997) (allegations that officers constructed false story to induce prosecution, then voluntarily provided false information at every step of the proceedings, prevented officers from claiming absolute immunity for grand jury and trial testimony, for purposes of motion to dismiss); *Mejia v. City of New York*, 119 F.Supp.2d 232, 272 (E.D.N.Y. 2000) (officers may be considered complaining witnesses if they give false information to a prosecutor and thereby induce the prosecutor to act); *cf. Anthony v. Baker*, *supra*, 955 F.2d at 1399, n. 2 (a person who actively instigates *or encourages* the prosecution of a plaintiff is a complaining witness); *cf. also Cervantes v. Jones*, *supra*, 188 F.3d at 810 (where officer was only witness at grand jury proceeding, and was the only investigator and the one who kept the investigation going, question

13

of whether officer was a complaining witness was "a closer question than the district court suggested").

Neither Zuments nor Bryant filed a criminal complaint or an affidavit for arrest warrant in this case.[5]  At this point, however, there is no evidence before the Court explaining how the prosecutor came to decide to seek a grand jury indictment against Plaintiff, almost a year after receiving the police file containing reports from Zuments and Bryant, and almost two years after the incident occurred.  It is thus impossible to determine whether Zuments or Bryant, or both, encouraged the case to be prosecuted, or simply responded to requests to appear at the grand jury proceeding.  At this time, therefore, the Court will not grant absolute immunity to either Zuments or Bryant for their grand jury testimony.

**Fourth Amendment Claim:**  Plaintiff's Fourth Amendment claim may be summarized as follows:  (1) Plaintiff had a right not be arrested in the absence of probable cause; (2) Zuments and Bryant had a duty to perform a constitutionally acceptable investigation prior to the arrest, in order to ensure there actually was probable cause for the arrest; and (3) due to the lack of such investigation, as well as the knowing or reckless misrepresentations by Zuments and Bryant at the grand jury proceeding, Plaintiff was indicted and arrested without probable cause.  In seeking summary judgment on this claim, Defendants make several arguments.  First, they contend neither Zuments nor Bryant had the requisite state of mind to raise their actions to the level of a

---

[5]The Court notes that Plaintiff requested discovery in order to determine whether either officer had filed a criminal complaint against him.  As Defendants pointed out in response, however, the answer to this question should be a matter of public record and it is therefore not necessary to allow discovery to answer it.  Several months have passed since the briefs in this case were filed, and Plaintiff has not notified the Court of any evidence that either Zuments or Byant filed such a complaint.  The Court therefore assumes no such evidence exists.

constitutional violation.  Second, they argue there was probable cause to arrest Plaintiff,

independent of any misrepresentations or omissions made by Zuments or Bryant.  Finally, they

maintain that neither Zuments nor Bryant made the decision to indict or arrest Plaintiff, so neither

should be liable for any violation of Plaintiff's Fourth Amendment rights that might have

occurred.

The general legal principles applicable to this arrest-without-probable-cause claim are as

follows.  An arrest that is made without probable cause is a violation of the Fourth Amendment

and gives rise to a claim under 42 U.S.C. § 1983.  *Pierce v. Gilchrist*, 359 F.3d 1279, 1292-97

(10th Cir. 2004) (discussing constitutional malicious-prosecution claim); *Baptiste v. J.C. Penney

Co., Inc.*, 147 F.3d 1252, 1256 (10th Cir. 1998).  This may be true even if the arrest is not made

by the defendant police officers, but is pursuant to a grand jury indictment, if the defendants'

unconstitutional actions caused the indictment to issue.  *Pierce*, 359 F.3d at 1292; *Jones v. City of

Chicago*, 856 F.2d 985, 994 (7th Cir. 1988).  According to most Circuits, including the Tenth

Circuit by implication, police officers have a duty to perform a constitutionally reasonable

investigation before a probable cause determination, and concomitant arrest, occurs.  *Kuehl v.

Burtis*, 173 F.3d 646, 650 (8th Cir. 1999); *Rankin v. Evans*, 133 F.3d 1425, 1435-36 (11th Cir.

1998); *Oliveira v. Mayer*, 23 F.3d 642, 647 (2d Cir. 1994); *Clipper v. Takoma Park, Maryland,*

876 F.2d 17,  *Moore v. The Marketplace Restaurant*, 754 F.2d 1336, 1345-46 (7th Cir. 1985); *cf.

Baptiste, supra,* 147 F.3d at 1259 ("[P]olice officers may not ignore easily accessible evidence

and thereby delegate their duty to investigate" before making a probable cause determination);

*Romero v. Fay*, 45 F.3d 1472, 1476-77 (10th Cir. 1995) (discussing cases that require officers to

interview witnesses readily available at the scene, investigate basic evidence, and otherwise

inquire if a crime has been committed at all); *cf. also Clipper v. Takoma Park, Maryland*, 876 F.2d 17, 18-20 (4th Cir. 1989) (where identification of robber was uncertain, officers violated Fourth Amendment by failing to view videotapes of robbery and failing to interview alibi witnesses).

It is clear, however, that the Constitution does not entitle a suspect to a perfect investigation. *See Beard v. City of Northglenn, Colorado*, 24 F.3d 110, 116 (10th Cir. 1994) (failure to investigate a matter fully, to exhaust every available lead, or to interview all potential witnesses will rarely constitute a violation of the Fourth Amendment); *see also Wadkins v. Arnold*, 214 F.3d 535, 541 (4th Cir. 2000) (standing alone, failure to pursue exculpatory lead does not negate probable cause for arrest. Once an officer has accumulated sufficient evidence to constitute probable cause, the officer has no constitutional obligation to continue to investigate the matter despite the possibility that further investigation might uncover exculpatory evidence. *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 790 n. 8 (3d Cir. 2000); *Garcia v. City of Chicago, Illinois*, 24 F.3d 966, 970 (7th Cir. 1994). On the other hand, exculpatory evidence may not be ignored in deciding whether probable cause exists; instead, the totality of the circumstances must be examined. *Williams v. Cambridge Bd. of Educ.*, 370 F.3d 630, 637 (6th Cir. 2004); *Kuehl*, *supra*. In addition, even if probable cause would ordinarily be provided by a victim's or eyewitness's statements, if there is information indicating a reason to doubt the accuracy of those accounts, further investigation will be necessary to make an arrest constitutional. *See Baptiste, supra*; *Moore, supra*; *Spiegel v. Cortese*, 966 F.Supp. 684, 699-700 (N.D. Ill. 1997) (arresting plaintiff on the sole basis of claims made by persons who held grudges against plaintiff, when that fact was known to officers, could be objectively unreasonable); *cf.*

16

*Pierce v. Gilchrist*, *supra* (even if probable cause exists initially, information may later come to light that eliminates probable cause).  Finally, mere negligence in performing an investigation will not give rise to a constitutional claim; instead, either a deliberate or reckless failure to investigate must be present.  *Beard, supra.*

  **State of Mind Requirement--Intentional or Reckless Action:**  The actions of Zuments and Bryant must be examined in light of the above standards to determine whether either has acted in a manner that could be found a violation of the Fourth Amendment.  Zuments' actions, as detailed above,  were as follows:  he was present when Boy and Mother were interviewed by Leiding; he reported that Boy accused Plaintiff of poking him in the butt, even though Boy never said a name but only said "He" did it; he reported that Leiding had found a large tear consistent with digital penetration, when in fact Leiding found three small abrasions that were "nonspecific indications"; he talked to at least one person who was present at the studio when the incident occurred; and he testified at the grand jury in a manner consistent with his report.   Zuments played no other role in the investigation of the alleged crime, and as a patrol officer he had no duty to conduct such an investigation.

  Under the circumstances of this case, even viewed in the light most favorable to Plaintiff, the Court finds Zuments' conduct did not rise above the level of negligence.  Although Boy never said the name "Mark" during his interview, Mother was unequivocal in giving that name and in accusing Plaintiff.  It is understandable that when Boy said "he" poked me in the butt, Zuments would interpret that to mean Plaintiff, whose name was the only one known to Zuments at the time.  Furthermore, stating that Leiding had described the condition of Boy's anus as "consistent" with digital penetration is not as egregious as Plaintiff claims.  Leiding herself testified that her

phrase, non-specific indications of digital penetration, means that the condition of Boy's rectum could be consistent with digital penetration, although it could also be consistent with other causes such as constipation or rough toilet paper.  [Exh. 3, MSJ, p. 68]  Finally, describing the condition of the rectum as having a "large tear" may be a prejudicial misstatement, as the idea of a "tear" to a layperson could be more serious than the three abrasions noted by Leiding..  However, this exaggeration of the physical evidence is not of the same caliber as complete fabrication of evidence and there is no indication that Zuments made his statement deliberately or recklessly.[6] *See Devlin v. Smalley*, 4 F.Supp.2d 1315, 1322 (D. Utah 1998) (errors in investigator's report did not rise to level of recklessness).  As to Zuments' grand jury testimony, he simply repeated the contents of his report, with the embellishment that Boy "kept repeating" that "Mark" poked him in the butt.  [Exh. 6, p. 12]  Again, while this inaccurate statement may have been negligent and was certainly regrettable, it does not rise to the level of reckless or deliberate falsehood.  As to Defendant Zuments, therefore, summary judgment will be granted on Plaintiff's Fourth Amendment claim.  *See Beard, supra*, 24 F.3d at 115-16 (deliberate or reckless behavior is necessary to support constitutional claim; negligence is not sufficient).

The question of recklessness is more difficult with respect to Bryant's actions, as viewed in the light most favorable to Plaintiff.  Unlike Zuments, Bryant was the investigating officer and had a duty to perform a reasonable investigation before turning the matter over to the district attorney's office, especially since as far as can be determined on this record, Bryant's report was

---

[6]In fact, at the criminal trial Zuments conceded he might have misunderstood what Leiding was saying and did not insist that his version of the conversation was correct.  [Exh. 2A, pp. 155-56]  While this is evidence of negligence, it is not so serious as to rise to the level of recklessness, especially in light of Leiding's opinion that tears and abrasions are the same thing.

the sole basis for the decision to pursue an indictment.[7]   As discussed above, there is evidence in

this case from which a reasonable fact-finder could conclude that Bryant did no investigation at all

into the case, other than attending the Safe House interview and reading, but not following up on,

police reports concerning Plaintiff.  The Safe House interview revealed nothing suspicious, which

should have been a signal that further investigation might be warranted to determine whether a

crime had indeed been committed.  *Cf. Idaho v. Wright*, 497 U.S. 805, 821 (1990) (one factor

related to reliability of child witness in sexual abuse case is consistent repetition); *United States v.

NB*, 59 F.3d 771, 776 (8th Cir. 1995) (in assessing reliability of child's hearsay testimony, one

factor to consider is whether the child consistently repeated the same facts to adults).

Furthermore, the alleged victim was less than three years old, which is an indication he might be

susceptible to suggestion by others.  *See* Lyon, Thomas D., *Applying Suggestibility Research to

the Real World:  The Case of Repeated Questions*, 65-Wtr Law & Contemp. Probs. 97, 102

(Winter 2002).  Instead of looking into the matter further, however, Bryant did nothing.  He did

not contact Leiding himself to hear her version of the interviews of Boy and Mother; he did not

obtain a copy of Leiding's written report; because he did not talk to Leiding himself, he had no

opportunity to be told about Dr. Lieberman's digital examination of Boy; he also had no

opportunity to find out about Dr. Lieberman's findings (or lack thereof) concerning physical

indications of sexual abuse; and he did not interview any of the potential witnesses who were at

the studio on the night in question.

---

[7]If the assistant district attorney handling the case performed an independent investigation
prior to deciding to pursue an indictment, rather than simply relying on the report submitted by
Bryant, that fact could break the chain of causation between Bryant's actions and the subsequent
indictment.  At this point, however, no facts showing that this might be true have been presented
to the Court.

Bryant's failure to conduct any serious investigation[8] occurred even though he had almost

a year to investigate the matter, before he forwarded his report to the district attorney's office.

Unlike many of the cases discussing a law enforcement officer's duty to investigate, this was not a

situation in which an officer had to make a quick decision to arrest or not arrest a suspect.  Bryant

had the time and opportunity to conduct as much of an investigation as he wished.  *Cf. Kuehl v.*

*Burtis*, *supra*, 173 F.3d at 650 (officers have duty to conduct reasonably thorough investigation

before arrest, in absence of exigent circumstances and so long as law enforcement will not be

unduly hampered if officers wait to obtain more facts before making arrest).  Furthermore, the

crime Bryant was supposed to investigate was a serious crime with extremely serious

consequences.  Not only was the crime a felony, but in New Mexico conviction as a sex offender

carries with it additional stigma and consequences that are even more significant than those

attending other types of felonies.  *See* NMSA § 30-9-11(C)(1) (criminal sexual penetration of

minor is first-degree felony); § 29-11A-1 *et seq.* (statute requiring New Mexico sex offenders to

register with law enforcement authorities and disclose location of their residence).  Under these

circumstances, a reasonable factfinder could determine that Bryant acted recklessly in performing

no real investigation at all before writing his report.  It is true Bryant was not required to

interview every witness, and did not have to continue to investigate once he was aware of

reasonably reliable information providing probable cause.  However, when the Safe House

interview failed to provide any corroboration of the alleged abuse, a fact issue arises as to whether

a prudent investigator should have realized some follow-up inquiry would be necessary.  Given

---

[8]The Court must emphasize that this opinion should not be read as holding that Bryant in fact did not do any investigation; viewing the evidence in the light most favorable to Plaintiff, for summary-judgment purposes only, leads to that conclusion.

the serious nature of the alleged crime, the fact that the alleged victim was a small child who was not repeating his allegations in the Safe House interview, and the fact that Bryant had ample opportunity to perform additional investigation, it would be possible for a reasonable factfinder to conclude that Bryant's failure to do anything to confirm whether the incident actually happened was reckless.[9]

**Existence of Probable Cause:**  Defendant contends in essence that it does not matter what Bryant or Zuments did or did not do, as there was probable cause to indict Plaintiff independent of the officers' actions and omissions.  Even if law enforcement officers,  in the process of making a probable-cause determination, have falsely included inculpatory evidence or have wrongly omitted exculpatory evidence, there is no Fourth Amendment violation if probable cause was present without considering the officers' wrongful actions.  *See, e.g., Wolford v. Lasater,* 78 F.3d 484, 489 (10th Cir. 1996) (deciding whether omitted facts would not have vitiated probable cause for the arrest warrant).  The procedure the Court must follow is to disregard any false information injected into the case by the officers, and to include any exculpatory information that was wrongly omitted.  *Id.*; *see also Pierce v. Gilchrist, supra*, 359 F.3d 1293.  In this case, which involves a reckless failure to discover evidence, the Court will consider evidence that Bryant could have reasonably discovered had he performed any investigation at all following the Safe House interview.  *See, e.g., Kuehl v. Burtis, supra,* 173 F.3d at 650-51 (in analyzing probable cause question, court considered evidence officer would

---

[9]In reaching this decision, the Court has not considered some of the outright mis-statements of fact made by Bryant in his grand jury testimony, such as his claim that Plaintiff had left the state and could not be found.  These statements, while undoubtedly prejudicial to Plaintiff since they implied he had fled to avoid facing charges, are collateral to the issue of probable cause.

21

have discovered if he had interviewed readily available eyewitness); *Clipper v. Takoma Park*, *Maryland*, *supra*, 876 F.2d at 19-20 (considering information from alibi witnesses officers unreasonably failed to interview).

Viewed in the light most favorable to the Plaintiff, the evidence considered by the district attorney's office and the grand jury in this case, assuming a reasonable investigation, would have been as follows. First, from Leiding's and Zuments' written reports: At the hospital Mother told Leiding and Zuments that, after being with Plaintiff for an extended period of time, Boy had said to Mother "My butt hurts"; Mother had asked Boy what happened, and Boy said "Mark poked my butt"; Plaintiff had admitted taking Boy to the bathroom; Boy volunteered at the hospital that "He stuck his finger in my butt"; Leiding's examination of Boy's rectum revealed three abrasions, injuries that were "non-specific indications for digital penetration"; the exam neither confirmed nor denied sexual assault. Second, from a review of Dr. Lieberman's report, which Bryant presumably would have obtained after interviewing Leiding and finding out that Dr. Lieberman had reportedly digitally examined Boy before Leiding performed her examination: an external exam of Boy's rectum was "completely normal"; there was a slight reddening on the anal surface; Boy was not uncomfortable during the exam and did not talk about any sexual contact. Third, by interviewing Mr. Wilson, the most significant witness from the studio, who gave Mother and Boy a ride home from the studio: Mother prompted Boy a number of times as to the identity of the alleged perpetrator, repeatedly asking him, "Did Mark do this to you?" Fourth, by interviewing other employees of the studio: Mother brought Boy back to the studio with her the day after the alleged incident, even though Plaintiff was also there; Mother apparently expected to finish her recording session, which would have meant studio employees would again have been in charge of

Boy, as they were the night before.  Finally, from interviewing Leiding concerning her

examination of Boy, as well as her first and second interviews of Mother:  Dr. Lieberman

performed a digital examination of Boy's rectum, which could have compromised the sexual-

assault examination that Leiding subsequently performed; Boy never identified the person who

"stuck his finger in my butt," referring to him only as "he"; by the time Leiding examined Boy a

little more than a week after the first examination, the abrasions found during the first exam were

completely healed, but there was a new healing abrasion in a different location; and there were a

number of possible causes for the abrasions found by Leiding during the first exam, including

constipation or wiping with rough toilet paper.

   Taking into account the above evidence, the probable cause issue, like the "recklessness"

issue, is a close call.  On the one hand, Mother stated that Boy had identified Plaintiff as the man

who poked Boy's butt.  Mother also stated that Plaintiff had admitted he had an opportunity (in

the bathroom) to molest Boy, and that Boy had behaved strangely after being with Plaintiff.  Even

though Mother did not witness the incident, a hearsay statement from a victim is generally

sufficient to provide probable cause.  *See, e.g., Costello v. United States*, 350 U.S. 359, 363

(1956) (grand jury indictment is valid even if only evidence presented is hearsay); *United States v.

1948 South Martin Luther King Dr.*, 270 F.3d 1102, 1112-13 (7th Cir. 2001) (hearsay evidence is

admissible in determining probable cause, so long as there is strong indicia of reliability).  On the

other hand, a reasonable investigation would have uncovered a substantial amount of evidence

contradicting Mother's account of what had happened to Boy.  When Dr. Lieberman first

examined Boy, there were no physical signs of penetration, Boy was not uncomfortable during the

examination, and Boy never mentioned anything about any sort of contact with his rectum.  After

Dr. Lieberman digitally examined Boy's rectum, Leiding found the three abrasions that are the only physical evidence of any type of penetration, which leads to the conclusion that it was Dr. Lieberman's examination, rather than any contact by Plaintiff, that caused the abrasions. Furthermore, after Dr. Lieberman's examination, Boy several times told Leiding and Zuments that "He" poked Boy's butt.  A short time later, however, in a safe interview environment, Boy said nothing about any sexual contact, just as he had said nothing to Dr. Lieberman a few hours after the incident supposedly occurred.  There is also evidence that while Mother "coached" Boy on the way home from the studio, she was apparently so unconcerned about the incident that she returned to the studio, with Boy, the very next day.[10]

   As noted above, in deciding whether probable cause exists, the totality of the circumstances must be considered.  *See Williams v. Cambridge Bd. of Educ.*, *supra,* 370 F.3d at 637; *Kuehl*, *supra*, 173 F.3d at 650; *Baptiste*, *supra*, 147 F.3d at 1259.  The totality of the circumstances includes any exculpatory evidence that the officers are aware of, or should have become aware of by dint of a reasonable investigation.  *Williams; Kuehl; Baptiste.*  Information that casts doubt on the reliability of evidence obtained from a victim or another witness must not be ignored, but must be included in the probable-cause calculus.  *Baptiste; Moore v. The Marketplace Restaurant, supra,* 754 F.2d at 1344-47*; Spiegel v. Cortese*, *supra*, 966 F.Supp. at 699-700.  Viewing the evidence in the light most favorable to Plaintiff, this case involves a small child who did not repeat any account of sexual contact consistently; failed to say anything to a

---

[10]It should be emphasized again that the Court is not determining that all of the foregoing evidence would necessarily have been discovered if Bryant had performed a constitutionally adequate investigation.  These "factual" statements only indicate the evidence that Bryant might well have discovered, viewing the matter in a light most favorable to Plaintiff.

doctor intimately examining him a relatively short time after the alleged incident; made the "he poked me in the butt" statement to neutral third parties only after he had been digitally examined by that doctor; had been coached by his mother to say that Plaintiff did something to him; and failed to say anything during a follow-up interview by a professional who presumably had training in eliciting such statements from children.  Furthermore, there was initially no physical evidence of digital penetration, and such evidence appeared only after the child was digitally examined by the first doctor.  Finally, even that physical evidence could neither confirm nor deny that any digital penetration or contact had occurred, as there were a number of other possible causes for the abrasions found during Leiding's examination.

Although it is a close call, the Court finds that the inconsistent information from the alleged victim as to whether any crime had occurred, together with the lack of physical evidence of such a crime, lessens the impact of Mother's hearsay account of what had happened to Boy to the extent that the probable cause created by that account was vitiated.  Mother's account certainly provided reasonable suspicion to investigate further, even given the evidence recited above indicating doubt as to whether any sexual contact had occurred between Plaintiff and Boy. In sum, however, the hearsay account of what Boy had told Mother was sufficiently contradicted by Boy's repeated failures to repeat the allegation to anyone else, except to report what Dr. Lieberman had done to him,[11] to  "warrant a person of reasonable caution" to have doubts whether the "facts and circumstances from a reasonably trustworthy source" indicated that "a crime has been ... committed by the person to be arrested." *United States v. Pearson*, 203 F.3d

---

[11]Once again, viewing the evidence in the light most favorable to Plaintiff, the Court must assume Boy was reporting what Dr. Lieberman had done, rather than what Plaintiff had done.

1243, 1268 (10th Cir. 2000) (stating probable cause standard).  For summary-judgment purposes only, therefore, the Court will find that a genuine issue of material fact exists as to whether the information submitted to the grand jury, as "corrected" by the information that would have been discoverable through a constitutionally reasonable investigation, provided probable cause to indict Plaintiff.

**Fact That Defendants Zuments and Bryant Did Not Indict Plaintiff:**  Defendants argue that neither Zuments nor Bryant arrested Plaintiff or initiated criminal proceedings against him, and therefore neither can be found liable for violating his Fourth Amendment rights.  In the Tenth Circuit, however, it is clear that an officer can be liable for a Fourth Amendment violation even if he did not personally arrest or charge the plaintiff.  What matters is whether the officer had an active part in causing or continuing the criminal proceedings, in the absence of probable cause. *See Pierce v. Gilchrist, supra,* 359 F.3d at 1292.  As pointed out above in the section concerning absolute immunity, there is no evidence in the case, at least at this point, that anyone in the district attorney's office performed any independent investigation prior to taking the matter to the grand jury.  Furthermore, the only witnesses at the grand jury proceedings were Mother, Zuments, and Bryant, and the latter two merely summarized the contents of their reports in their testimony before the grand jury.  Therefore, the allegedly constitutionally deficient investigation, which led to the omission of critical exculpatory evidence, could be found to have played a major role both in the decision to convene a grand jury and in the grand jury's decision to indict Plaintiff.  Under

26

these circumstances, Defendant Bryant cannot escape his potential liability by pointing to the fact

that he personally did not arrest Plaintiff, or charge Plaintiff with a crime.[12]

**State-Law False Imprisonment Claim:**  Defendants make the same arguments with

respect to this claim as they do concerning the Fourth Amendment claim:  that Zuments and

Bryant did not have the requisite state of mind, that no false arrest occurred because there was

probable cause, and that Zuments and Bryant did not personally arrest Plaintiff or charge him with

a crime.  The Court notes that deliberate or reckless action on the part of either Defendant is not

necessary for purposes of this state-law claim; it is sufficient if one or both of the officers

negligently caused a Fourth Amendment violation to occur.  *See, e.g., McDermitt v. Corrections

Corp. of America*, 814 P.2d 115, 117 (N.M. App. 1991) (under Tort Claims Act, negligent

actions that cause others to violate a person's constitutional rights can be the basis of a claim).

Furthermore, the officers need not commit the constitutional violation personally, if their

negligence causes it to be committed by someone else.  *Id.*  The Court has already held above that

a reasonable factfinder could determine there was an arrest without probable cause in this case,

due to the potentially constitutionally deficient investigation.  There are questions of fact as to

whether Zuments acted negligently by including in his report and his testimony false statements,

such as the assertion that Leiding had found a "large tear" that was "consistent with" digital

penetration, rather than the abrasions she actually found that could neither confirm nor deny

sexual assault.  There are also questions of fact as to whether Bryant recklessly or negligently

failed to conduct any independent investigation at all after attending the Safe House interview.

---

[12]As the Court has held above, there is no issue of fact as to whether Defendant Zuments
acted more than negligently in his report and grand jury testimony.  The Court therefore confines
its holding on this argument to Defendant Bryant.

For these reasons, the Court will not grant summary judgment to either Defendant Zuments or Defendant Bryant on the state-law false-arrest claim.

      **Municipal Liability:**   In order to hold Defendant City of Santa Fe liable for a constitutional violation, Plaintiff must be able to prove there was a custom, policy, or lack of training that led to the potential constitutional violation identified above. *See Winters v. Bd. of County Comm'rs*, 4 F.3d 848, 855 (10th Cir. 1993).  Plaintiff has requested discovery in order to determine what type of training the City offers to officers charged with investigating sexual abuse cases involving children.  Since the Court has found a genuine issue of material fact as to whether a Fourth Amendment violation did occur in this case, the Court will allow the municipal-liability claim to proceed, at least until the requested discovery has been performed.

      **Conclusion**

      Based on the foregoing, the Court will grant summary judgment to Defendant Zuments on Plaintiff's constitutional claims.  Summary judgment will be granted to all Defendants on the due-process claims.  Summary judgment will be denied to Defendant Bryant and the City on the Fourth Amendment claim.  Finally, summary judgment will be denied to all Defendants on the state-law claims.

**ORDER**

      Based on the foregoing Memorandum Opinion,  it is hereby ORDERED that Defendants' motion for summary judgment (Doc. 15) be, and hereby is, GRANTED in part and DENIED in part; and that Plaintiff's motion to supplement the record (Doc. 27) be, and hereby is, GRANTED.  The parties are ordered to confer with the presiding magistrate to establish a discovery schedule as soon as possible.

28

Dated this 9th day of March, 2005.


BRUCE D. BLACK
United States District Judge

**ATTORNEYS:**
**For Plaintiff:**
Joseph P. Kennedy
Shannon L. Oliver

**For Defendants:**
Stephen G. French
Robert W. Becker